# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DOUGLAS GORACKE,

     Plaintiff,

     v.

     Case No. 2:17-CV-2664-JAR

ATCHISON HOSPITAL ASSOCIATION,

     Defendant.

## MEMORANDUM AND ORDER

Plaintiff, Dr. Douglas Goracke, brings this action against Defendant Atchison Hospital Association ("the Hospital"), alleging improper medical inquires, improper disclosure of confidential information, and disability discrimination under the Rehabilitation Act,[1] and violations of both the Fair Credit Reporting Act ("FCRA")[2] and the Kansas Fair Credit Reporting Act ("KFCRA").[3]  This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment (Doc. 121) and Defendant's Motion for Summary Judgment (Doc. 123).  For the reasons stated in this opinion, the Court **denies** Plaintiff's motion and **grants** Defendant's Motion for Summary Judgment in its entirety.

## I.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[4] In applying this standard, the Court views the evidence and all reasonable inferences therefrom

---

[1] 29 U.S.C. § 794(d).

[2] 15 U.S.C. § 1681 et seq.

[3] K.S.A. § 50-702 et seq.

[4] Fed. R. Civ. P. 56(a).

in the light most favorable to the nonmoving party.[5]  "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[6]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[7]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[8]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[9]  In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[10]

Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[11]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[12]  Rather, the nonmoving party must "set forth specific facts that would be

---

[5] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[6] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[7] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[8] *Adler*, 144 F.3d at 670 (citing *Anderson*, 477 U.S. at 248).

[9] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[10] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[11] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[12] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[13]  In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[14]  To successfully oppose summary judgment, the nonmovant must bring forward more than a mere scintilla of evidence in support of his position.[15]  A nonmovant may not create a genuine issue of material fact with unsupported, conclusory allegations."[16]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy, and inexpensive determination of every action."[17]  "Where, as here, the parties file cross-motions for summary judgment, [the Court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[18]  The Court considers cross-motions separately: the denial of one does not require the grant of the other.[19]  "To the extent the cross-motions overlap, however, the Court may address the legal arguments together."[20]  The material facts are uncontroverted in this case, and the legal issues asserted in both motions overlap.  The Court therefore addresses those issues together.

---

[13] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71); *see Kannady*, 590 F.3d at 1169.

[14] *Adler*, 144 F.3d at 671.

[15] *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993).

[16] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006).

[17] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[18] *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[19] *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

[20] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (quotations omitted).

## II.     Uncontroverted Facts

The Hospital is located in Atchison, Kansas.  Plaintiff is an anesthesiologist, licensed in Kansas and Missouri, who worked as an independent contractor at the Hospital since 1992.  Per Plaintiff's contract, he was the exclusive anesthesia provider at the Hospital.  In 2011, the parties signed the most recent provider contract, which included a clause allowing either party to terminate it upon 120-days' notice.  The Hospital Board of Directors ("the Board") delegated authority to approve Plaintiff's contract to the Hospital CEO, John Jacobson.  Jacobson approved Plaintiff's 2011 contract without the Board's approval.

When Plaintiff first applied for clinical privileges in 1992, he answered "No" to the question, "Do you currently have a physical or mental health condition that affects or is likely to affect your ability to perform professional or Medical Staff duties?"[21]  He disclosed that he had a benign brain tumor surgically removed in 1991 and provided a treating physician's certification that he was unconditionally released to return to the practice of anesthesiology.  Removal of the tumor led to some memory loss, but this impairment does not and has never impaired Plaintiff's ability to perform his job.  Plaintiff compensates for the impairment by taking thorough notes and detailing information immediately when he is told.  In each of his biennial applications for clinical privileges, Plaintiff recertified that he had no limitations that affected his ability to practice anesthesiology.  Plaintiff was uniformly viewed as a very able anesthesiologist by the Hospital, with no questions as to his competence or judgment.

On December 12, 2016, a former Hospital employee filed a complaint against the Hospital with the Kansas Human Rights Commission ("KHRC") alleging "unwanted verbal and

---

[21] Doc. 123-3 at 7.

physical sexual harassment by [the Hospital's] anesthesiologist."[22]  On January 3, 2017, another former Hospital employee filed a KHRC complaint against the Hospital alleging, "I was subject to physical sexual harassment by [the Hospital's] anesthesiologist," and further that "female patients were subjected to unwanted verbal and physical sexual harassment by this same anesthesiologist."[23]  In early 2017, the Hospital notified Plaintiff that it had received these complaints against him, but allowed Plaintiff to continue working without restrictions or limitations.

The Hospital retained Jill Waldman, a licensed attorney at Lathrop Gage, LLP, to investigate Plaintiff's alleged inappropriate behavior.  From January 18, 2017 to February 20, 2017, Waldman interviewed eighteen different individuals connected with the Hospital, including Plaintiff.  Based on her interviews, legal education, and legal experience, Waldman prepared a report of her investigation, dated February 24, 2017, which included an analysis of the potential legal exposure faced by the Hospital due to Plaintiff's alleged inappropriate behavior.

The report detailed multiple allegations of inappropriate sexual behavior by Plaintiff toward staff and patients, including repeated sexual comments and innuendos, "touchy feely" conduct such back massages and shoulder rubs, inappropriately uncovering, exposing, and touching the breasts of female patients when applying "bair huggers," inappropriately being "handsy" with female patients, and "odd" behavior such as having patients undress completely for epidurals, asking patients if their breasts are numb following an epidural, standing at the foot of the bed in the delivery room, and staying in the delivery room after his work is done, even when asked to leave.[24]  The report also detailed reports that Plaintiff "can be hostile, rude,

---

[22] Docs. 123-4 at 8; 123-5 at 8.

[23] Doc. 123-5 at 8.

[24] Doc. 127-3 at 3–10.

sarcastic, and/or condescending," and further that he "can be arrogant, demeaning, difficult, confrontational, and/or snarky."[25] "Several reported that [Plaintiff] is a bully."[26] Plaintiff denies these allegations and reports that "he is tough, is very demanding, has high standards, is a perfectionist, and is strict."[27]

The Board was informed of the KHRC complaints against Plaintiff at its January 2017 meeting. In late February 2017, the Board received a verbal summary of Waldman's report. At this point, the Board took charge of the matter involving Plaintiff and began to issue direction.[28] The Board decided to terminate Plaintiff's exclusive provider/medical director contract without cause and provided the required 120-day notice of termination. Through a March 15, 2017 letter signed by Jacobson, the Board offered to negotiate a new exclusive provider/medical director contract with Plaintiff, provided that he undergo an outpatient professional assessment and "agree to complete any and all conditions recommended in the assessment."[29] The letter also required Plaintiff to "authorize the hospital to communicate with the facility regarding [his] treatment."[30]

Plaintiff underwent a multidisciplinary outpatient assessment at Professional Renewal Center ("PRC") in Lawrence, Kansas from May 4, 2017 to May 7, 2017. PRC is a Kansas corporation organized to provide evaluation and treatment/remediation services to professionals. PRC's evaluation process comes from the Federation of State Medical Board guidelines for state

---

[25] *Id*. at 10.

[26] *Id*.

[27] *Id*. at 11.

[28] Doc. 123-6 at 25:2–9. Plaintiff admits this fact. Doc. 126 at 10.

[29] Doc. 123-11 at 2.

[30] *Id*.

medical boards to address sexual boundary issues in physicians.[31]  The evaluation is "based on a biopsychosocial approach coupled with consideration of the American Board of Medical Specialties/Accreditation Council of Graduate Medical Education core competency areas.  The assessment is intended to identify potential contributory factors to the identified areas of concern, and how to address/remediate these areas of concern."[32]

Plaintiff's evaluation included psychological tests, interviews about Plaintiff's addictions, obsessions, and compulsions, a physical examination and laboratory testing, interviews regarding Plaintiff's medications, family history, surgical history, and past trauma, testing of Plaintiff's intellectual functioning, testing for bipolar disorder, anxiety, and other mental disorders, and an interview regarding Plaintiff's sexual behaviors.  The Hospital did not place limits on the testing to be conducted by PRC, nor was the hospital aware of the areas PRC would test during the multidisciplinary assessment.

PRC prepared a report, summarizing the results of Plaintiff's assessments.  The report mentioned that Plaintiff had a brain tumor removed in 1989, with a reoccurrence in his third ventricle, and noted that Plaintiff "does demonstrate significant memory difficulties."[33]  Under the "Fitness to Practice and Recommendations," PRC discussed Plaintiff's inconsistent monitoring of his own statements and behaviors, failure to pick up on feedback from others, and poor decisions related to comments or behaviors that others view as inappropriate or offensive.

---

[31] Doc. 127-12 ¶ 26; *see* Addressing Sexual Boundaries: Guidelines for State Medical Boards, Federal of State Medical Boards (May 2006), https://www.fsmb.org/siteassets/advocacy/policies/grpol_sexual-boundaries.pdf.

[32] Doc. 127-12 ¶ 26.  Defendant asserts that this statement requires expert testimony and the affiant has not been designated an expert.  To the extent the affidavit contains expert opinion testimony, the Court disregards those portions.  Fed. R. Evid. 701.  However, to the extent the affiant presents factual evidence based on her personal knowledge, the Court finds those statements are admissible.

[33] Doc. 123-15 at 5.

The report included a disclaimer which read: "This information has been disclosed to you from records protected by Federal Confidentiality Rules (42 CRF Part 2) and is being released on the basis that it not be re-disclosed to anyone, including the patient."[34]  Plaintiff signed two "Authorization to Exchange Information" forms with PRC, one authorizing the exchange of information with Andy Ramirez, the Hospital Attorney,[35] and the other with Jacobson, CEO at Atchison Hospital.[36]  Prior to the report's disclosure, Plaintiff spoke to Jacobson about the discharge summary and asked Jacobson not to share the report with anyone because he did not want the information in the report to get out in the community or to his children.  In June 2017, the Board reviewed the PRC report via a secure portal through the website of the Hospital's outside law firm, Lathrop Gage.

The Board communicated a new exclusive provider contract offer to Plaintiff through a June 2, 2017 letter from Jacobson.  The June letter required that Plaintiff (1) comply with PRC's recommendations, (2) cooperate with an internal monitoring program administered by members of the Hospital's medical staff, (3) "participate in a professional's program" to address the issues that led to the referral at PRC, and (4) "seek and share with PRC and the Board the results of a consultation with a neurologist."[37]  The letter also stated that the evaluation by PRC would be ongoing until the Board determined that the issues that led to the evaluation had been resolved.[38]  The Board considered Plaintiff to be a competent physician and was prepared to offer him a new contract, however, Plaintiff did not sign the new contract.  Per the terms of the initial termination

---

[34] Doc. 123-5.  42 CRF Part 2 protects the confidentiality of Substance Use Disorder Patient Records.

[35] Doc. 123-22.

[36] Doc. 123-23.

[37] Doc. 123-16.

[38] *Id.*

letter, Plaintiff's contract with the Hospital ended on or about July 13, 2017. Plaintiff continued to practice medicine at the Hospital until August 14, 2017 because Jacobson granted an extension.

As a member of the Hospital medical staff, the Bylaws generally applied to Plaintiff. Under the bylaws, a medical staff member is entitled to a fair hearing if a "corrective action" resulting in "reduction, suspension, or revocation of clinical privileges or suspension or revocation of Medical Staff membership" is taken against them.[39] Corrective action may include (1) a letter of warning; (2) a letter of admonition or reprimand; (3) imposition of probation; (4) reduction, suspension, or revocation of clinical privileges; (5) modification or continuation of previously imposed summary suspension; (6) suspension or revocation of Staff membership; or (7) a fine.[40] Plaintiff did not have a hearing prior to the Board's decision to terminate his existing contract and impose conditions on its renewal.

The members of the Executive Committee, who were not aware of the specific allegations against Plaintiff, recommended to the Board that the harassment allegations against Plaintiff be vetted through peer review. The Board did not follow this recommendation, although they did impose internal monitoring of Plaintiff's behavior by hospital medical staff as one condition of his new contract. In 2015 and 2017, two other Hospital medical personnel engaged in allegedly disruptive behaviors, including yelling and cursing at staff, but the Board did not require these individuals to attend a multidisciplinary outpatient assessment.

---

[39] Doc. 126-3 at 27.

[40] *Id*. at 40.

## III.    Discussion

### A.    Count I: Improper Medical Examination

Both parties move for summary judgment on Count I, which alleges that the Hospital required Plaintiff to submit to an improper medical examination in violation of the Rehabilitation Act.  Plaintiff asserts that the Hospital violated his rights by requiring him to undergo an overly-broad medical examination, which was likely to elicit information about a disability.  The Hospital asserts that under the Rehabilitation Act, the inquiry must have been intended to or necessitated revealing a disability, which it was not, and further, the medical examination was job-related and consistent with business necessity.

The Rehabilitation Act incorporates the "standards applied under title I of the American with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.)."[41]  Under Title I of the American with Disabilities Act ("ADA"),

> [a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.[42]

"This prohibition is intended to prevent inquiries of employees that do not serve legitimate business purposes."[43]

The Rehabilitation Act differs critically from the ADA in one respect, namely that the Rehabilitation Act expressly prohibits discrimination *solely* on the basis of disability.[44]  "The ADA, on the other hand, proscribes discrimination 'on the basis of disability[,]' 42 U.S.C. §

---

[41] 29 U.S.C. § 794(d).

[42] 42 U.S.C. § 12112(d)(4)(A).

[43] *Riechmann v. Cutler-Hammer, Inc.*, 95 F. Supp. 2d 1171, 1184 (D. Kan. 2000) (citing 29 C.F.R. Pt. 1630, App. § 1630.13(b)).

[44] 29 U.S.C. § 794(a).

12112(a) (2009) or, before its amendment in 2008, 'because of the disability.'"[45]  Under the

ADA, a medical inquiry is improper if it "may tend to reveal a disability."[46]  Both the Fifth and

Sixth Circuits, however, have applied the "sole cause" requirement from the Rehabilitation Act

to the medical inquiry standard in cases brought under the Rehabilitation Act, holding that the

medical inquiry must be "intended to reveal or necessitates revealing a disability" to violate the

act.[47]  Other courts have applied the "tend to reveal" standard to claims arising under both the

ADA and Rehabilitation Act, although typically when those statutes are pled together.[48]

Regardless of the standard applied, a medical examination and inquiry may be permissible if the

"examination or inquiry is shown to be job-related and consistent with business necessity."[49]

The Court need not decide the proper standard because the Court finds that the Hospital's inquiry

was job-related and consistent with business necessity.

The Tenth Circuit has noted that there is little case law concerning "the proper

interpretation of business necessity."[50]  "[C]ourts will readily find a business necessity if an

employer can demonstrate that a medical examination or inquiry is necessary to determine . . .

whether the employee can perform job-related duties when the employer can identify legitimate,

non-discriminatory reasons to doubt the employee's capacity to perform his or her

duties."[51]  "An employer's request that an employee undergo a medical examination must be

---

[45] *Lee v. City of Columbus*, 636 F.3d 245, 250 n.4 (6th Cir. 2011).

[46] *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 95 (2d Cir. 2003).

[47] *Lee*, 636 F.3d at 255; *Taylor v. Shreveport*, 798 F.3d 276, 284 (5th Cir. 2015).

[48] *See, e.g.*, *Bomba v. Dep't of Corr.*, No. 16-cv-1450, 2018 WL 7019254, at *12 (M.D. Pa. Sept. 4, 2018); *Scott v. Napolitano*, 717 F. Supp. 2d 1071, 1084 (S.D. Cal 2010); *Downs v. Mass. Bay Transp. Auth.*, 13 F. Supp. 2d 130, 138 (D. Mass. 1998).

[49] 42 U.S.C. § 12112(d)(4)(A).

[50] *Adair v. City of Muskogee*, 823 F.3d 1297, 1312 (10th Cir. 2016) (quoting *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003)).

[51] *Id.* (quoting *Conroy*, 333 F.3d at 98).

supported by evidence that would 'cause a reasonable person to inquire as to whether an employee is still capable of performing his job.'"[52]  Equal Employment Opportunity Commission ("EEOC") guidance under the ADA suggests that an inquiry is job-related and consistent with business necessity when an employer "has a reasonable belief, based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition."[53]

The Hospital received two KHRC complaints alleging "unwanted verbal and physical sexual harassment by Respondent's anesthesiologist,"[54]  and that "female patients were subjected to unwanted verbal and physical sexual harassment by this same anesthesiologist."[55]  In response to these complaints, the Hospital hired Waldman to conduct an internal investigation regarding Plaintiff's behavior.  Her report detailed multiple allegations of inappropriate sexual behavior by Plaintiff toward staff and patients, including sexual comments and innuendos, "touchy feely" conduct, inappropriately uncovering and exposing female patients, inappropriately touching female patients, including touching their breasts while applying "bair huggers," and delivery room behavior described by multiple obstetricians as "odd."[56]

After receiving this internal report, the Hospital terminated its exclusive provider contract with Plaintiff and stipulated its renewal on Plaintiff undergoing a multidisciplinary outpatient assessment.  Plaintiff underwent a comprehensive biopsychosocial assessment at PRC, which evaluated his physical, mental, and psychological health and his sexual behaviors.  PRC's

---

[52] *Id.* (quoting *Conrad v. Bd. of Johnson Cty. Comm'rs*, 237 F. Supp. 2d 1204, 1230 (D. Kan. 2002)).

[53] *Equal Employment Opportunity Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act*, 2000 WL 33407181, at *6 (July 27, 2000).

[54] Docs. 123-4 at 8; 123-5 at 8.

[55] Doc. 123-5 at 8.

[56] Doc. 127-3 at 3–10.

evaluation process comes from the Federation of State Medical Board guidelines for state medical boards to address sexual boundary issues in physicians.[57]

As an initial matter, the Court finds that Plaintiff's contention that this could not have been business necessity because similarly situated individuals were not subjected to the evaluation to be without merit. While "an employer's standard practice with regard to medical examinations is certainly relevant evidence of what is 'necessary,'"[58] there is no evidence in the record that the other two hospital staff named by Plaintiff were facing allegations of sexual misconduct with patients. The alleged "disruptive behaviors" of the other hospital staff—specifically, cursing and yelling at staff—were of a different kind and degree than the allegations against Plaintiff. Accordingly, the Court finds that the Hospital's actions with regard to these staff members is not evidence of the Hospital's standard practice.

Next, Plaintiff asserts that the Court should only consider whether the medical inquiry was consistent with his essential duties as an anesthesiologist, namely, examining patients to assess their physical condition, ordering necessary tests and lab work, providing necessary consults, administering anesthetic, providing continuous monitoring of patients in the operative suite, providing necessary medication, and monitoring the patient during the acute recovery phase.[59] The Court finds, however, that this list ignores the essential duties of Plaintiff's job as a physician, a professional engaged in a career of public trust. Allegations of sexual misconduct involving patients, such as those alleged here—namely, inappropriately uncovering and exposing female patients, inappropriately touching female patients' breasts, or inappropriately engaging in

---

[57] *See* Addressing Sexual Boundaries: Guidelines for State Medical Boards, Federal of State Medical Boards (May 2006), https://www.fsmb.org/siteassets/advocacy/policies/grpol_sexual-boundaries.pdf.

[58] *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001).

[59] Doc. 122 at 5.

sexual conversations with patients—certainly betray public trust. While Plaintiff repeatedly refers to his behavior as merely "disruptive,"[60] the uncontroverted facts demonstrate that the alleged conduct was far more serious. The Hospital required the evaluation only after conducting a month-long investigation to validate concerns raised in two separate KHRC complaints filed against Plaintiff, one of which explicitly referenced his inappropriate conduct with patients.[61] The Hospital referred Plaintiff to an institution specializing in evaluating professionals, and the comprehensive evaluation was based on guidelines from the Federation of State Medical Boards to assess sexual boundary issues in physicians.[62]

Plaintiff argues that the Hospital cannot point to the informal blanket guidance of the Federation of State Medical Boards because no entity is excused from the need to conduct an individualized evaluation. He cites *Nichols v. City of Mitchell* in support, where a district court granted summary judgment for the plaintiffs on their ADA claims after finding that the plaintiffs were improperly required to submit to a medical examination.[63] In *Nichols*, the employer—a transport company operating solely in South Dakota—required its employees to submit to a Department of Transportation medical certification examination, which is required for interstate truck drivers.[64] The Court held the examination requirement violated the ADA because "there was no individualized assessment of each plaintiff's ability to perform the job safely."[65]

---

[60] *See, e.g.*, Doc. 122 at 2, 23.

[61] Doc. 123-5 at 8.

[62] *See* Addressing Sexual Boundaries: Guidelines for State Medical Boards, Federal of State Medical Boards (May 2006), https://www.fsmb.org/siteassets/advocacy/policies/grpol_sexual-boundaries.pdf.

[63] 914 F. Supp. 2d 1052, 1060–61 (D.S.D. 2012).

[64] *Id*. at 1060.

[65] *Id*. at 1061.

Here, however, Plaintiff was required to undergo a holistic medical evaluation after the Hospital received two KHRC complaints against him and conducted a month-long individualized investigation into Plaintiff's behavior toward staff and patients at the Hospital. The investigation validated concerns about his sexual boundaries with patients, and accordingly, the Hospital— through PRC—evaluated Plaintiff based on alleged sexual misconduct discovered in the investigation. The Court does not make a broad statement regarding when a comprehensive medical examination may be required of employees. Rather, the Court finds that under the facts of this case—a physician facing allegations of sexual misconduct involving patients—the Hospital did not violate the letter or spirit of the Rehabilitation Act in requiring Plaintiff to undergo a holistic evaluation based on the Federation of State Medical Boards guidelines.

Given the undisputed facts about what the Hospital knew at the time it required Plaintiff to undergo the evaluation, the Court finds that were "legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties."[66] Further, the Court finds that allegations of sexual misconduct with patients would certainly "cause a reasonable person to inquire" whether a physician is capable of performing his job, namely, whether it is safe and prudent for patients to be under Plaintiff's care.[67] Accordingly, the Court finds that the medical inquiry required of Plaintiff was job-related and consistent with business necessity and grants summary judgment for the Hospital.

---

[66] *Adair v. City of Muskogee*, 823 F.3d 1297, 1312 (10th Cir. 2016) (quoting *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003)).

[67] *Equal Employment Opportunity Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act*, 2000 WL 33407181, at *2 (July 27, 2000).

### B. Count II: Confidentiality Violation

Both parties move for summary judgment on Count II, which alleges that the Hospital improperly disclosed the results of Plaintiff's medical examination. Plaintiff asserts that the disclosure of the PRC report to the Board violated his confidentiality. The Hospital responds that the disclosure was restricted to the agents of the Hospital—the Board—and further, that the report was kept confidential.

As an initial matter, the Court notes that the confidentiality language on the PRC Exchange of Information form does not govern Plaintiff's claim; rather, the standards of the Rehabilitation Act and ADA govern whether there is genuine issue of material fact as to whether the Hospital violated the law.

The ADA requires that "information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record."[68] "Employers may share such information only in limited circumstances with supervisors, managers, first aid and safety personnel, and government officials investigating compliance with the ADA."[69] This provision is incorporated into the Rehabilitation Act, under which Plaintiff brings his claim.[70] Based on the plain language of the statute and the policies behind enacting it, the Court finds that the Hospital's conduct did not violate the Rehabilitation Act.

The Court finds the Northern District of Georgia's analysis in *Floyd v. Sun Trust Banks, Inc.*[71] instructive. In *Floyd*, it was undisputed that the individual to whom the examination was

---

[68] 42 U.S.C. § 12112(d)(3)(B).

[69] *Equal Employment Opportunity Enforcement Guidance*, 2000 WL 33407181, at *2 (citing 42 U.S.C. § 12112(d)(3)(B)).

[70] 29 U.S.C. § 794(d).

[71] 878 F. Supp. 2d 1316 (N.D. Ga. 2012).

disclosed did not fit one of the stated exceptions to the statute—a supervisor being informed of an accommodation, first aid personnel, or government officials investigating ADA compliance—and further, the file was properly kept separately.[72]  Thus, the *Floyd* court found the relevant question to be whether the confidential information was kept as a confidential medical record.[73]  Similarly, here, the members of the Board do not meet a statutory exception, and there are no allegations that the file was not kept separately.  Accordingly, the question presented is whether the PRC report was kept as a confidential medical record when Jacobson and Ramirez received it and shared it with the Board.

In *Floyd*, the court considered the definition of confidential: "The Black's Law Dictionary defines 'confidential' as '[e]ntrusted with the confidence of another or with his secret affairs or purposes.'  Thus, a 'confidential medical record' is a medical record that is kept in confidence."[74]  "Section 12112(d)'s confidentiality requirement balances . . . competing interests by ensuring that the information disclosed pursuant to an employer's medical inquiry spreads no farther than necessary to satisfy the legitimate needs of both employer and employee."[75]  The court rejected the plaintiff's contention that *any* disclosure necessarily violates confidentiality under the ADA, and found that the proper question is whether the disclosure was for a "legitimate non-discriminatory" purpose and extends "no further than necessary so it remains confidential."[76]  In *Floyd*, the information was given to an attorney for the purpose of defending

---

[72] *See id.* at 1323.

[73] *Id.*

[74] *Id.* (citing DELUXE BLACK'S LAW DICTIONARY 297 (6th ed. 1991)).

[75] *Id.* at 1324 (quoting *Doe v. U.S. Postal Serv.*, 317 F.3d 339, 344 (D.C. Cir. 2003)).

[76] *Id.* at 1325.

against a FLSA lawsuit.[77]  The court held that "this limited disclosure does not cut against the ADA's policy of preventing bias and stigma in the workplace."[78]

In the present case, the purpose of the disclosure was to inform the Board—the agents of the Hospital responsible for ordering the evaluation and determining the terms of Plaintiff's new contract—of the results of his evaluation.  While Plaintiff only specifically signed a release of the report to two named individuals, Jacobson and Ramirez,[79] the Board had previously communicated with Plaintiff and specifically told him that he must "authorize *the hospital* to communicate with the facility regarding [his] treatment."[80]  It is uncontroverted that the Board controlled the matter involving Plaintiff and that the Board was responsible for offering Plaintiff a new contract.[81]  Moreover, it is undisputed that Plaintiff's service contract was between him and the Hospital, which was governed by the Board.[82]  In the present case, the Hospital was acting through the Board.

The disclosure of the report to the Board was for a legitimate, non-discriminatory purpose: making an informed business decision pursuant to an evaluation conducted in response to concerns that Plaintiff was acting in a sexually inappropriate manner with female staff and patients.  The purpose of the confidentiality provision of the ADA, namely, "avoiding subjecting employees to the blatant and subtle stigma that attaches to being identified as disabled,"[83] is in no way impacted by the Board of a Hospital using a permissible medical inquiry for the narrow

---

[77] *Id*. at 1325.

[78] *Id*. at 1326.

[79] Docs. 123-22; 123-23.

[80] Doc. 123-11 (emphasis added).

[81] Doc. 123-6 at 25:2–9.  Plaintiff admits this fact.  Doc. 126 at 10.

[82] Doc. 123-1.

[83] *Doe v. U.S. Postal Serv.*, 317 F.3d 339, 344 (D.C. Cir. 2003) (internal quotation removed).

and legitimate purpose of determining whether a physician is fit to practice medicine and tailoring his contract to the findings of that inquiry. Moreover, the disclosure went "no further than necessary."[84] There are no allegations that this information was disclosed outside the Board, nor any evidence that this information was used for any purpose other than determining (1) whether the Hospital ought to offer Plaintiff a contract and (2) what the conditions of that contract ought to be. As discussed above, the Hospital had a legitimate, job-related business reason to require Plaintiff undergo the evaluation in the first place, and subsequently, the Hospital had a legitimate, non-discriminatory reason to share the information with the individuals acting as the Hospital's decision-makers with regard to Plaintiff's position at the Hospital. There is no genuine issue of material fact as to whether the report was maintained as a confidential medical record. Accordingly, the Court grants summary judgment on Count II for the Hospital.

### C. Count III: Disability Discrimination

The Hospital moves for summary judgment on Count III, which alleges that Plaintiff was discriminated against on the basis of his disability in violation of the Rehabilitation Act. Defendant asserts that Plaintiff cannot establish a *prima facie* case of disability discrimination because he does not have a disability that substantially limits his life activities, and further, that he cannot demonstrate a genuine issue of material fact that his disability was the sole cause of his termination. Plaintiff responds that genuine issues of material fact exist as to each element of his claim.

To establish a *prima facie* case of disability discrimination under the Rehabilitation Act, Plaintiff must show that (1) he has a disability, (2) he is otherwise qualified, with or without

---

[84] *Id.*

reasonable accommodation, and (3) "[the adverse action occurred] under circumstances which give rise to an inference that [the adverse action] was based solely on his disability."[85]  A disability under both the ADA and Rehabilitation Act is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[86]  Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."[87]  Whether or not an impairment "substantially limits" a major life activity "is not meant to be a demanding standard," and "should not demand extensive analysis."[88]  To show that his disability substantially limits his ability to perform these major life activities, Plaintiff must show that he is substantially limited in his ability to perform the major life activity "as compared to most people in the general population."[89]  This analysis requires an "individual assessment."[90]  "A medical diagnosis is insufficient; rather, the [Rehabilitation Act] requires plaintiffs to offer evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial."[91]

It is undisputed that Plaintiff suffers from a memory impairment stemming from removal of a brain tumor in 1989.  Assuming, *arguendo*, that Plaintiff's life activities are substantially limited, he falls far short of establishing a genuine issue of material fact that his termination was

---

[85] *See Williams v. Widnall*, 79 F.3d 1003, 1005 (10th Cir. 1996).

[86] 42 U.S.C. § 12102(1); 29 U.S.C. § 794(d).

[87] 42 U.S.C. § 12102(2)(A).

[88] 29 C.F.R. § 1630.2(j)(1)(i),(iii).

[89] *Id.* § 1630.2(j)(1)(ii).

[90] *Id.* § 1630.2(j)(1)(iv).

[91] *Wilkerson v. Shinseki*, 606 F.3d 1256, 1262 (10th Cir. 2010).

"based *solely* on his disability."[92]  An employer makes an adverse employment decision "solely" because of its employee's disability when "the employer has no reason left to rely on to justify its decision *other* than the employee's disability."[93]  Here, it is uncontroverted that the Hospital received two KHRC complaints alleging that Plaintiff sexually harassed female staff and patients.  The Hospital then conducted a month-long internal investigation into these complaints and substantiated multiple allegations that Plaintiff was sexually inappropriate with staff and patients.  Accordingly, the Hospital terminated its contract with Plaintiff and conditioned a new contract on Plaintiff being evaluated for these concerns and complying with any resulting recommendations from the evaluation.  Even viewing all facts in the light most favorable to Plaintiff, no reasonable jury could infer that the Hospital acted solely on the basis of Plaintiff's memory impairment.  Indeed, Plaintiff presents no evidence from which a jury could infer that his memory impairment was in *any way* the cause of the Board's actions, much less the sole cause.  He makes no argument as to how he bears his burden of establishing an inference that his disability was the sole cause of the Hospital's actions—an element of his *prima facie* case—but instead jumps to evidence which he claims demonstrates pretext, the third prong of the *McDonnell Douglas* burden shifting analysis.[94]

The *McDonnell Douglas* burden shifting analysis applies to claims based on circumstantial evidence brought under the Rehabilitation Act.[95]  Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to establish legitimate, non-discriminatory

---

[92] *Williams v. Widnall*, 79 F.3d 1003, 1005 (10th Cir. 1996) (emphasis added).

[93] *Verkade v. U.S. Postal Serv.*, 2010 WL 2130616, 378 F. App'x 567, 578 (6th Cir. 2010) (unpublished) (alteration in original).

[94] Doc. 126 at 30–31.

[95] *See, e.g.*, *Cummings v. Norton*, 393 F.3d 1186, 1189 (10th Cir. 2005).

reasons for decision.[96]  If established, the burden shifts to the plaintiff to show that those reasons are pretextual.[97]  As explained above, the Court finds that Plaintiff cannot establish a *prima facie* case of disability discrimination, rendering a pretext analysis unnecessary.  Out of an abundance of caution, the Court addresses Plaintiff's pretext arguments below.

Plaintiff argues that he can demonstrate pretext because (1) the Hospital did not comply with its own bylaws in taking corrective action against Plaintiff; (2) the Hospital did not follow an Executive Committee recommendation with regard to Plaintiff's discipline; (3) the proposed contract following the PRC report was "worse;" (4) the proposed terms of the new contract went beyond PRC's recommendations; (5) the Hospital allowed Plaintiff to work during the 120-day notice period following the initial termination letter; and (6) similarly situated staff were treated more favorably.

Plaintiff's arguments regarding pretext are without merit.  First, the uncontroverted facts demonstrate that the bylaws, which define "corrective action," do not apply to the Hospital's termination of an exclusive provider contract.[98]  It is undisputed that Plaintiff's medical privileges at the Hospital were not affected.  Second, it is uncontroverted that the Executive Committee did not know the details of the allegations against Plaintiff.  Further, the Board imposed internal monitoring—the recommendation of the Executive Committee—as one of Plaintiff's new contract conditions.  Third, the Court finds that Plaintiff's contention that his new contract was "worse" to be without merit.  It is uncontroverted that the Hospital imposed

---

[96] *Id.* As discussed above, the Hospital's legitimate reason for its actions is that it was facing legal exposure from multiple sexual harassment complaints filed against the Hospital because of Plaintiff's actions.

[97] *Id.*

[98] Corrective action may include (1) a letter of warning; (2) a letter of admonition or reprimand; (3) imposition of probation; (4) reduction, suspension, or revocation of clinical privileges; (5) modification or continuation of previously imposed summary suspension; (6) suspension or revocation of Staff membership; or (7) a fine.  Doc. 126-3 at 40.

conditions on Plaintiff's new contract after receiving the results of the PRC report; the imposition of conditions was consistent with the Board's original letter to Plaintiff, which specifically said "a new contract . . . shall include terms addressing behavioral issues that have led us to terminate the existing agreement."[99]  Fourth, the Court finds that Plaintiff has put forth no evidence to support his contention that the Hospital agreed to be limited by PRC's recommendations in determining what terms would be included in his new contract.  Fifth, Plaintiff has put forth no evidence to support his speculation that the Hospital was not genuinely concerned about his behavior.  It is undisputed that the Hospital conducted a month-long internal investigation into Plaintiff's behavior and terminated his original contract within weeks of receiving the investigation results.  It is also undisputed that the Hospital hoped to resolve the situation in a way that retained Plaintiff as the Hospital's primary anesthesiologist.  Finally, as discussed above, the Court finds that neither of the two hospital staff accused of disruptive behavior are similarly situated to Plaintiff because the uncontroverted facts demonstrate that they were not facing allegations of sexual misconduct with patients.  Even drawing all inferences in favor of Plaintiff, the Court finds there is no genuine issue of material fact as to whether the Board acted—at the *very least*, in part—based on the sexual harassment allegations against Plaintiff and the results of its internal investigation.

Plaintiff bears the burden of presenting evidence from which a reasonable jury could find that the Hospital's articulated reason is pretextual.[100]  In the present case, he must present evidence from which a reasonable jury could conclude that the *sole reason* the Hospital took

---

[99] Doc. 123-11.

[100] *See Cummings*, 393 F.3d at 1189.

action was because of his memory impairment.  Plaintiff has not done so here.  Accordingly, the Court grants summary judgment for the Hospital with regard to Count III.

### D.  Count IV and V: Fair Credit Reporting Act Violations

The Hospital moves for summary judgment on Counts IV and V, which allege consumer reporting violations under both the FCRA and KFCRA based on Waldman's internal investigation and report.  Plaintiff asserts that Waldman was not acting as attorney when she conducted an independent investigation at the hospital, and therefore her report violated the FCRA because she did not have Plaintiff's consent as to the scope or disclosure of the report. "The Kansas Fair Credit Reporting Act is modeled on the federal Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681t. 'Therefore, case law interpreting the federal Act, although not controlling, is persuasive.'"[101]  Accordingly, the Court considers the FCRA and KFCRA claims together.

The FCRA was enacted "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer . . . information in a manner which is fair and equitable to the consumer."[102]  A consumer report includes a communication of information by a consumer reporting agency related to a consumer's "character, general reputation, [and] personal characteristics."[103]  However, a "report containing information solely as to transactions or experiences between the consumer and the person making the report" is excluded from the definition of a consumer report.[104]

---

[101] *McKown v. Dun & Bradstreet, Inc.*, 744 F. Supp. 1046, 1050 (D. Kan. 1990) (citing *Peasley v. TeleCheck of Kan., Inc.*, 637 P.2d 437, 440 (Kan. 1981)).

[102] 15 U.S.C. § 1681(b).

[103] 15 U.S.C. § 1681a(d)(1).

[104] 15 U.S.C. § 1681a(d)(2)(A)(i).

As an initial matter, the Court addresses Plaintiff's contention that the Hospital "disavowed an attorney-client relationship with Waldman."[105] The Court finds this statement to be wholly without support. In so arguing, Plaintiff points to the following exchange:

> Q: So Jill Waldman, though, was not acting as a lawyer on behalf of the hospital when she did the investigation, correct?
>
> A: Jill Waldman's responsibility was to investigate the facts and provide a recommendation and a report to the Board of Directors, which is what she did.[106]

The Court finds that Jacobson's statement does not create a genuine issue of material fact as to whether Waldman acted as an attorney in conducting the investigation. Immediately prior to the statement quoted above, Jacobson testified that "[the Hospital] used legal counsel" to conduct an investigation into Dr. Goracke,[107] and that "the investigator was employed with Lathrop Gage and had significant experience and knowledge in this particular aspect of law."[108] Plaintiff's counsel repeatedly questioned Jacobson as to whether Waldman was an independent investigator and whether she conducted an independent investigation; he responded "yes," which "in [his] opinion" that meant, "she was under no duress or obligation to report in any particular manner," because "she was not under [his] control."[109]

No reasonable jury could find that the above exchange constitutes disavowal of the attorney-client relationship. At no point did Jacobson affirmatively respond that Waldman was not acting as an attorney. Further, Waldman's report contained both a factual summary and legal

---

[105] Doc. 126 at 42.

[106] Doc. 126-2 at 36:23–37:4.

[107] Doc. 126-2 at 33:5–7.

[108] *Id.* at 33:20–24.

[109] *Id.* at 34:9–35:2.

advice regarding potential legal exposure.[110]  Even viewing the facts in the light most favorable to Plaintiff, the Court finds there is no genuine issue of material fact as to whether the Hospital retained Waldman in any capacity other than as an attorney with expertise in employment law.

In arguing that Waldman was solely an independent investigator and therefore subject to FCRA requirements, Plaintiff relies on an FTC Staff Opinion, which reads, "once an employer turns to an outside organization for assistance in investigation of harassment claims  . . . the assisting entity is a [Credit Reporting Agency] because it furnishes 'consumer reports to a 'third party' (the employer)."[111]  The Court is not bound to give deference to the opinion letter.  "Under prevailing principles of administrative law, however, the FTC opinion letters are entitled to respect but not deference."[112]  The Supreme Court has held that "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference.  They are entitled to respect, but only to the extent that they are persuasive."[113]

Here, the Court finds that the opinion letter is neither persuasive nor applicable in the present case.  The "outside organization" turned to by the Hospital was a law firm, Lathrop Gage.  "In the context of the FCRA, several courts have explained that an attorney who conducts an investigation on behalf of an employer-client is not a 'third party' in the same way that a credit bureau or detective agency would be."[114]

> When an attorney conducts for an employer/client an investigation of an employee's dealings with the employer, he is acting *as* the client, just as would be the case if the employer had

---

[110] *See* Doc. 123-10 at 13.

[111] FTC Staff Opinion Ltr., 1999 WL 33932152, at *1–2 (Apr. 5, 1999).

[112] *Hartman v. Lisle Park Dist.*, 158 F. Supp. 2d 869, 876 (N.D. Ill. 2001).

[113] *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (internal quotation removed).

[114] *Mattiaccio v. DHA Grp., Inc.*, 21 F. Supp. 3d 15, 22 (D.D.C. 2014) (collecting cases).

one of its employees conduct the investigation. This is qualitatively
different from the situation that exists when an employer contracts
with an outside entity lacking a fiduciary and agency relationship
like that of attorney and client.[115]

"There is nothing in the FCRA or its history that indicates that Congress intended to abrogate the

attorney-client or work-product privileges, as would be the effect of applying the FCRA's

requirements (which include disclosure of the report) to [internal investigation by an entity's

attorney]."[116]  It is well-established that an attorney is an agent of their client when acting on

behalf of their client.[117]  Accordingly, the Court finds that Waldman was acting as the attorney-

agent of the Hospital when conducting her internal investigation.

Moreover, the Court finds that Waldman's report constitutes a "report containing

information solely as to transactions or experiences between the consumer [Plaintiff] and the

person making the report [the Hospital]."[118]  Waldman "conduct[ed] an investigation concerning

alleged inappropriate behavior concerning Douglas Goracke."[119]  She investigated "virtually all

aspects of Dr. Goracke's history at [the Hospital]"[120] by interviewing eighteen individuals

associated with the hospital and prepared her findings and legal exposure conclusions in a

report.[121]  "[A] report prepared by an attorney about an employee's transactions or experiences

---

[115] *Hartman*, 158 F. Supp. 2d at 876–77.

[116] *Id.* at 876.

[117] *See, e.g.*, *Gripe v. City of Enid*, 312 F.3d 1184, 1189 (10th Cir. 2002); *Hartman*, 158 F. Supp. 2d at 876
(citing *Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998)); *Mattiaccio v. DHA Grp., Inc.*, 21 F. Supp. 3d 15,
22 (D.D.C. 2014).

[118] 15 U.S.C. § 1681a(d)(2)(A)(i).

[119] Doc. 123-10.

[120] Doc. 126-41.

[121] To the extent Plaintiff alleges that the report went beyond his relationship with the Hospital, the Court
finds this contention to be without support.  It is undisputed that the information in the report came from interviews
with hospital personnel or Plaintiff's personnel file at the Hospital, which includes a letter dated July 8, 1992 from
Plaintiff to the Hospital, which describes his 1989 arrest and subsequent plea. Doc. 123-3 at 16.

with the attorney's client (the employer) qualifies as a 'report containing information solely as to transactions or experiences between the consumer and the person making the report' within the meaning of § 1681a(d)(2)(A)(i)."[122]   Accordingly, the Court finds that Waldman's report does not constitute a consumer credit report and grants summary judgment for the Hospital on Counts IV and V.

   **IT IS THEREFORE ORDERED BY THE COURT** Plaintiff's Motion for Partial Summary Judgment (Doc. 121) is **denied** and Defendant's Motion for Summary Judgment (Doc. 123) is **granted**.  This case is dismissed in its entirety.

   **IT IS SO ORDERED.**

   <u>Dated: May 6, 2019</u>

<u>S/ Julie A. Robinson</u><br/>
JULIE A. ROBINSON<br/>
CHIEF UNITED STATES DISTRICT JUDGE

---

[122] *Hartman*, 158 F. Supp. 2d at 876.